Mark Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
Jack D. Yamin (Admitted *Pro Hac Vice*)
jyamin@edelson.com
Chandler R. Givens (Admitted *Pro Hac Vice*)
cgivens@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff and the Putative Classes*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| MIGUEL GARCIA, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>*v.*<br><br>ENTERPRISE HOLDINGS, INC. d/b/a Zimride, a Missouri corporation, and LYFT INC., a Delaware corporation,<br><br>*Defendants*. | Case No. 4:14-cv-00596-SBA<br><br>**RESPONSE IN OPPOSITION TO MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Date: June 10, 2014<br>Time: 1:00 p.m.<br>Dept: Courtroom 1, 4th Floor<br><br>Judge: Hon. Saundra B. Armstrong<br><br>Date Filed: February 7, 2014<br><br>Trial Date: None set |

## ISSUES TO BE DECIDED (L.R. 7-4(a)(3))

1. Does California Penal Code § 637.6 require, as an element, a third-party contractor relationship between a "private entity" and "person[s] . . . [with] access to personal information concerning an individual" even though neither the plain language of the section nor its legislative history suggests such a requirement?

2. Does a plaintiff state a claim under California Penal Code § 637.6 where a defendant (i) has access to his personal information in the course of establishing or implementing a private entity's rideshare program, (ii) discloses that same personal information to a third-party data analytics company for purposes that bear no relation to the rideshare program, and (iii) fails to obtain consent from the plaintiff for such disclosure?

3. Does California Penal Code § 637.2 require additional allegations of injury even though the section allows "any person who has been injured by a violation of this chapter [to] bring an action against the person who committed the violation" and provides that "[i]t is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages?"

# TABLE OF CONTENTS


I. INTRODUCTION ........................................................................................................1

II. BACKGROUND ..........................................................................................................2

A. Defendants employed "person[s]" in the business of "assist[ing] private entities" in establishing and implementing a carpooling or ridesharing program. .........................................................................................................4

B. The Zimride program is a "carpooling or ridesharing program." ............................8

C. Zimride "acquires [and] has access to" its users' personal information. ...............10

D. Zimride's disclosure of personal information to Mixpanel was not for the purpose of implementing the rideshare program. .................................................11

E. Plaintiff did not consent to Zimride's disclosure of his personal information to Mixpanel. ..........................................................................................................12

1. The privacy policy may not be considered on a motion to dismiss. ..........13

2. Plaintiff did not assent to the privacy policy. .........................................15

3. The privacy policy does not allow Zimride to make the disclosures alleged here. ...............................................................................................17

F. Plaintiff has standing to pursue his claim. ..........................................................18

IV. CONCLUSION...........................................................................................................19

## TABLE OF AUTHORITIES

### United States Supreme Court Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 12

*Barber v. Thomas*,
560 U.S. 474 (2010) ........ 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 12

*Fed. Land Bank of St. Paul v. Bismark Lumber Co.*,
314 U.S. 95 (1941) ........ 8

*Warth v. Seldin*,
422 U.S. 490 (1975) ........ 18

### United States Court of Appeals Cases

*Abdul-Jabbar v. General Motors Corp.*,
85 F.3d 407 (9th Cir. 1996) ........ 12

*Edwards v. First Am. Corp.*,
610 F.3d 514 (9th Cir. 2010) ........ 18

*FTC v. MTK Mktg., Inc.*,
149 F.3d 1036 (9th Cir. 1998) ........ 8

*Fulfillment Servs. Inc. v. United Parcel Serv., Inc.*,
528 F.3d 614 (9th Cir. 2008) ........ 18

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ........ 14

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ........ 13

*Robins v. Spokeo, Inc.*,
742 F.3d 409 (9th Cir. 2014) ........ 18

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) ........ 2

*Schlegel v. Wells Fargo Bank, NA*,
720 F.3d 1204 (9th Cir. 2013) .......... 2

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) .......... 15, 16

*United States v. Phillip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) .......... 9

*United States v. Farries*,
459 F.2d 1057 (3d Cir. 1972) .......... 6

**United States District Court Cases**

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
No. C 04-04825 JW, 2005 WL 756610 (N.D. Cal. Aug. 28, 2012) .......... 16

*Cvent, Inc. v. Eventbrite, Inc.*,
739 F. Supp. 2d 927 (E.D. Va. 2010) .......... 16

*Heinrichs v. Wells Fargo Bank, NA*,
No. C 13-05434 WHA, 2014 WL 985558 (N.D. Cal. Mar. 7, 2014) .......... 12

*In re Google Inc.*,
No. 13-MD-02430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......... 18, 19

*In re Google, Inc. Privacy Policy Litig.*,
No. C-12-01382-PSG, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013) .......... 13

*In re Hulu Privacy Litig.*,
No. C 11-03764 LB, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) .......... 1

*In re iPhone Application Litigation*,
No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) .......... 19

*Molnar v. 1-800-Flowers.com, Inc.*,
No. CV 08-0542 CAS (JCx), 2008 WL 4772125 (C.D. Cal. Sept. 29, 2008) .......... 16

*Nguyen v. Barnes & Noble, Inc.*,
No. 8:12-cv-0812-JST (RNBx), 2012 WL 3711081 (C.D. Cal. Aug. 28, 2012) .......... 16

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) .......... 15

*Ticketmaster LLC v. RMG Techs., Inc.*,
507 F. Supp. 2d 1096 (C.D. Cal. 2007) .......... 16

*Yunker v. Pandora Meida, Inc.*,
No. 11-CV-03113 JSW, 2013 WL 1282980 (N.D. Cal. Mar. 26, 2013) .............................. 19

**California Supreme Court Cases**

*Flanigan v. Flanigan*,
41 P.3d 575 (Cal. 2002) .............................................................................................. 8

*Ribas v. Clark*,
696 P.2d 637 (Cal. 1985) .............................................................................................. 19

**California Court of Appeals Cases**

*Binder v. Aetna Life Ins. Co.*,
89 Cal. Rptr. 2d 540 (Cal. Ct. App. 1999) .................................................................. 15

*Friddle v. Epstein*,
21 Cal. Rptr. 2d 85 (Cal. Ct. App. 1993) .................................................................... 19

**Statutes and Rules**

Cal. Penal Code § 637.2 .............................................................................................. 18, 19

Cal. Penal Code § 637.6 .............................................................................................. *passim*

Cal. Rules of Prof'l Conduct 5-200 .............................................................................. 8

N.D. Cal. Civil Local Rule 11-4(a) .............................................................................. 8

**Other Authorities**

*Blog*, Zimride,
http://www.zimride.com/blog/ (last visited May 12, 2014) ........................................... 9

*Commuting*, Genentech,
http://www.gene.com/careers/benefits/commuting (last visited May 12, 2014) .................... 4

*gRide*, Zimride,
http://www.zimride.com/gride/ (last visited May 12, 2014) ........................................... 9

*How it Works*, Zimride,
http://www.zimride.com/howitworks/ (last visited May 12, 2014) .................................... 9

*Press*, Zimride,
http://www.zimride.com/press/ (last visited May 12, 2014) .................................................. 9

PricewaterhouseCoopers, *U.S. Corporate Responsibility Report 2011* (2011), *available at*
http://www.pwc.com/en_US/us/about-us/corporate-responsibility/corporate-responsibility-report-2011/assets/document/pwc-crreport.pdf ..................................................... 4

*PwC My Ride*, Zimride,
http://www.zimride.com/pwc (last visited May 12, 2014) .................................................... 4

Restatement (Third) of Agency § 2.04 .............................................................................. 4

Zimride,
http://www.zimride.com (last visited May 12, 2014) .......................................................... 4

## I. INTRODUCTION

Participants in carpooling and ridesharing programs have a statutory right under California law to the privacy of their personal information. Cal. Penal Code § 637.6 (the "Ridesharing Privacy Statute"). Defendants Lyft, Inc. ("Lyft") and Enterprise Holdings, Inc. ("Enterprise") violated—and continue to violate—this statute by disclosing personal information obtained in the course of operating their respective ridesharing programs operated under the "Zimride" name. Specifically, Lyft and Enterprise (collectively, "Defendants") disclose Zimride users' names, addresses, e-mail addresses, genders, ages, zip codes, and information about their likes and dislikes to a third-party data analytics company called Mixpanel, which Mixpanel uses to create comprehensive digital profiles for use in targeted advertising or sale to other data brokers. Plaintiff Miguel Garcia ("Plaintiff"), a Zimride user, filed this putative class action to remedy this ongoing violation.

In moving to dismiss Plaintiff's First Amended Complaint (the "Complaint"), Defendants try to make hay of the fact that the Ridesharing Privacy Statute was enacted before commercial use of the internet, and thus does not apply to Zimride, which they describe as "an online real-time peer-to-peer ride-matching platform." (Defs.' Mot. to Dismiss, Dkt. 34 ("Mot.") at 1.) But no amount of internet industry jargon can hide the fact that Defendants' conduct violates both the letter and the spirit of the statute. The Ridesharing Privacy Statute was designed to—and does—protect drivers and riders participating in carpooling and ridesharing programs (like Zimride) from having their personal information disclosed to others, even if the nature of such programs changes over time. Indeed, the California legislature specifically noted that "personal information [is] being gathered at an increasing rate by businesses in the formation of carpool and rideshare programs," and that the statute constitutes a "'pre-emptive strike' against future problems" arising out of the "compilation of lists by residence, employment, etc. [that] might be sold to other businesses for promotional purposes." (Declaration of Benjamin S. Thomassen ("Thomassen Decl."), Ex. A at 13.) Simply put, using the internet to operate their rideshare programs does not insulate Defendants from the prohibitions of the statute.[1]

---

[1] Courts routinely apply statutes to situations involving technological changes arising after enactment of the statute. *See, e.g., In re Hulu Privacy Litig.*, No. C 11-03764 LB, 2012 WL 3282960, *6 (N.D. Cal. Aug. 10, 2012) (applying 1988 statute protecting videotape viewing privacy

Faced with a statute of undeniable applicability, Defendants assert a hodgepodge of arguments in an attempt to defeat Plaintiff's claim. Specifically, they argue—incredibly—that they do not "assist" in the establishment or implementation of carpooling or ridesharing programs, and that they do not have access to Zimride users' information. They also assert—contrary to the clear allegations of the Complaint—that their disclosure of users' information to Mixpanel is for the purpose of implementing the ridesharing program. In addition, they argue—relying on a document outside the pleadings—that users consent to the disclosure of their personal information, even though the purported consent is based on a privacy policy to which users never assent and which does not even allow the disclosures alleged here. Finally, in a footnote, Defendants assert that Plaintiff lacks standing despite clear and repeated Ninth Circuit authority to the contrary. As discussed below, all of these arguments are without merit and Defendants' Motion to Dismiss should therefore be denied.

## II. BACKGROUND

The facts here are not complicated.[2] In 2013, Enterprise—seeking to "complement [its] existing car-sharing, vanpooling, and car rental services"—sought to establish its own ridesharing program. (First Amended Complaint, Dkt. 29 ("FAC") ¶¶ 1, 13.) To do so, it acquired the "Zimride" business from Lyft and, thereafter, implemented "Zimride by Enterprise: the industry leading rideshare service" that presently enjoys over 350,000 users. (*Id.* ¶¶ 1-2, 12-13, n.1.) Using "Zimride's industry-leading technology," users log into the Zimride platform using a Facebook account and submit details about an upcoming trip either to solicit riders to accompany them, or to purchase a seat on a ride submitted by another user. (*Id.* ¶¶ 2, 14-17.) In addition, when logging into Zimride with a Facebook account (which is the only way to log into Zimride), users are informed that Zimride will receive from Facebook their public profile, friend list, e-mail address,

---

to online video streaming company, noting that "Congress was concerned with protecting the confidentiality of private information about viewing preferences regardless of the business model or media format involved," and that the act's protections "retain their force even as technologies evolve"); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951-54 (9th Cir. 2009) (applying 1991 telemarketing statute to text messages, even though statute was enacted before existence of text messaging).

[2] On a motion to dismiss, all well-pleaded factual allegations in the complaint are taken as true. *Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204, 1207 (9th Cir. 2013).

birthday, work history, education history, events, hometown, interests, current city, personal description, and likes. (*Id.* ¶¶ 15-16.) Unbeknownst to the users, however, the information they submit to Zimride is sent to a third-party data analytics company called Mixpanel every time a Zimride user "posts" a ride on the site (i.e., either as a rider or a driver). (*Id.* ¶¶ 3, 19.)

The information sent by Zimride to Mixpanel includes the user's gender, age, zip code, and trip details. (*Id.* ¶ 19.) Further, Zimride also sends to Mixpanel a link to the user's Facebook profile, from which Mixpanel is able to extract the user's Facebook data, including name, address, e-mail address, and information about the user's likes and dislikes. (*Id.* ¶¶ 19, 25.) Mixpanel uses the information it receives from Zimride to compile comprehensive profiles of consumers' entire digital lives. (*Id.* ¶¶ 4, 21-28.) These profiles are used for targeted advertising, sold as a commodity to other data brokers, or mined to produce valuable reports. (*Id.* ¶ 4.)

Plaintiff used Zimride's services in July and August 2012, and in May 2013, all times when Zimride was operated by Lyft. (*Id.* ¶¶ 31-33.) He also used Zimride in December 2013 when Zimride was operated by Enterprise. (*Id.* ¶¶ 32, 34.) Each time he submitted trip information through the rideshare service (i.e., whether through Lyft's rideshare service or the "Zimride by Enterprise" service), his personal information was sent to Zimride. (*Id.* ¶¶ 14-17.) Zimride would, in turn, both (i) use that information to facilitate a shared ride between Plaintiff and another user and (ii) send that personal information to Mixpanel. (*Id.* ¶¶ 33-34.) Plaintiff never consented to—much less had knowledge of—Defendants' disclosure of his personal information to Mixpanel. (*Id.*)

## III. ARGUMENT

Defendants' disclosure of Plaintiff's and other Zimride users' personal information to Mixpanel violates both the letter and the spirit of the Ridesharing Privacy Statute. In an attempt to avoid liability for their unlawful disclosures, Defendants press a host of arguments seeking to dismiss the Complaint. As discussed below, however, all of these arguments fail, and Defendants' motion to dismiss should therefore be denied.[3]

[3] Defendants argue that because the Ridesharing Privacy Statute is a penal statute, the rule of lenity applies. (Dkt. 34 at 6, 8) (citing *Harrott v. Cnty. of Kings*, 25 P.3d 649, 659 (Cal. 2001). But contrary to Defendants' assertion, the rule of lenity does not require that any penal statute be construed in a defendant's favor. Rather, the rule simply provides a method of resolving statutory

### A. Defendants employed "person[s]" in the business of "assist[ing] private entities" in establishing and implementing a carpooling or ridesharing program.

The Ridesharing Privacy Statute states that "[n]o *person* who . . . acquires or has access to personal information concerning an individual . . . for the purpose of assisting private entities in the establishment or implementation of carpooling or ridesharing programs, shall disclose that information to any other person . . . ." Cal. Penal Code § 637.6(a) (emphasis added). Defendants argue that the statute thus posits the existence of four parties: (1) private entities seeking to establish or implement a carpooling or ridesharing program, (2) persons who assist those entities in doing so, (3) individuals whose personal information is accessed or acquired, and (4) other persons to whom such information is disclosed. (Dkt. 34 at 6-7.) Defendants assert that they are "private entities" seeking to implement or establish carpooling or ridesharing programs, not "persons" assisting private entities in doing so, and are thus not covered by the statute. (*Id.*) The problem with Defendants' argument is that while they are correct that they are the "private entities," they indisputably employed (in the case of Lyft) or employ (in the case of Enterprise) "persons" to assist them in establishing and implementing their carpooling and ridesharing program. And because Defendants are liable for their employees' actions taken within the scope of employment, *see* Restatement (Third) of Agency § 2.04, they are liable under the Ridesharing Privacy Statute.[4]

---

ambiguity. *See, e.g., Barber v. Thomas*, 560 U.S. 474, 475 (2010) ("[T]he rule of lenity only applies if, after considering the text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute.") (internal quotations omitted). Here, there is no ambiguity or uncertainty in the Ridesharing Privacy Statute—let alone a grievous one—such that application of the rule of lenity is called for.

[4] It is also worth noting that Zimride has partnerships with universities and companies across the country, and thus, Defendants' employees also assist private entities such as Stanford, USC, Genentech, and PricewaterhouseCoopers (among many others) in establishing and implementing ridesharing programs. (Dkt. 29 ¶ 12); Zimride, http://www.zimride.com (follow "University and Corporate Networks" hyperlink) (last visited May 12, 2014). For example, Zimride assists Genentech with implementing their "gRide" carpooling program, and PricewaterhouseCoopers with their "PwC My Ride" rideshare program. *See Commuting*, Genentech, http://www.gene.com/careers/benefits/commuting (last visited May 12, 2014) (describing "Genentech's employee transportation program, gRide, [in which employees] can save time and money by sharing a ride and using carpool lanes….); *gRide*, Zimride, http://www.zimride.com/gride/ (last visited May 12, 2014) (describing "gRide Zimride" program); PricewaterhouseCoopers, *U.S. Corporate Responsibility Report 2011* at 60 (2011), *available at* http://www.pwc.com/en_US/us/about-us/corporate-responsibility/corporate-responsibility-report-2011/assets/document/pwc-crreport.pdf (explaining how PwC launched "PwC My Ride," a "carpooling matchmaker" and "ride-sharing tool"); *PwC My Ride*, Zimride, http://www.zimride.com/pwc (last visited May 12, 2014) (describing "PwC My Ride powered by zimride"). Thus, Defendants' apparent position that they do not assist private entities in the

Defendants read into the Ridesharing Privacy Statute a limitation to outside consultants or third-party contractors such that the "person[s]" who "assist" private entities in establishing or implementing carpooling or ridesharing programs cannot be employees of the "private entity." (Dkt. 34 at 1 ("Section 637.6 was enacted … to address the proliferation of *consultants*… who might share … personal information….") (emphasis added); *id.* at 6-7 ("Section 637.6 . . . address[es] [the] improper use of commuters' personal information *by third-party contractors*[.]") (emphasis added).) But the statute contains no such limitation—it only speaks of "persons" who have access to personal information in the course of business—and any attempt to artificially impose any such limitation creates gaping holes in the statute's coverage.

Indeed, under Defendants' view, it would be an absolute defense to the Ridesharing Privacy Statute if a private entity—like Lyft or Enterprise—*employed* rather than *contracted with* (*i.e.*, on a third-party basis) a person or business to establish a rideshare program.[5] Indeed, Enterprise presumably could have contracted with "Zimride by Lyft" on a third-party basis to implement the Enterprise rideshare program.[6] But, for reasons not made public—perhaps even to take advantage of the then-established Zimride-Mixpanel relationship[7]—they opted to acquire the Zimride business outright and establish their rideshare program in-house. (Dkt. 29 ¶ 13.) Thus, Defendants seem to believe—incorrectly—that because their own employees in the Zimride team assisted with the establishment and implementation of their respective rideshare programs, they were free to disclose Zimride users' personal information to whomever and for whatever purpose they pleased without

---

establishment and implementation of carpooling and ridesharing programs (i.e., even in a third-party contractor sense) is demonstrably false. Of course, the nature and extent of these relationships are a matter for discovery.

[5] Stated another way, rather than "contracting with" a person or team of people to establish a rideshare program, any private entity could simply acquire, buy, or employ such a person or team to establish or implement the program, and, in Defendants' view, avoid all liability under the Statute, even where personal information is disclosed by those "person[s]" employed or otherwise tasked with implementing the program. As explained below, that result is in clear conflict with the purpose of the Rideshare Privacy Statute.

[6] As noted, "Zimride by Enterprise" presently offers a rideshare implementation service on a third-party contracting basis. *See supra* note 4.

[7] As noted in the Complaint, the reasons for and details surrounding the purchase were not made public and will, here, be a topic for discovery. Regardless, it is notable that under Defendants' view of the Rideshare Privacy Statute, they have devised a way for them to turn a profit by disclosing their own rideshare users' personal information to a data analytics company.

violating the statute. But the text of the Ridesharing Privacy Statute makes no distinctions between *employing* persons to assist in establishing or implementing a rideshare program and *third-party contracting* with persons to assist in establishing or implementing a rideshare program. Indeed, it only discusses "*person*[s] who, in the course of business, acquire[] or ha[ve] access to personal information concerning an individual . . . for the purpose of assisting private entities in the establishment or implementation of carpooling or ridesharing programs." Cal. Penal Code § 637.6(a). Defendants employed persons who, in the course of business, acquired or had access to personal information concerning individual Zimride users when assisting Enterprise and Lyft in establishing or implementing their own ridesharing programs. Defendants cannot avoid liability by fabricating statutory limitations where none exist.[8]

Further, that employees (including Defendants' Zimride employees) can "assist" their employer in establishing or implementing a carpooling or ridesharing program is hardly controversial. Despite Defendants' effort to read one in, there is no requirement—either in the plain meaning of the word "assist" or in the text of the Ridesharing Privacy Statute—that the "person . . . assisting private entities" may not be an employee of or otherwise associated with the private entity that is establishing or implementing a carpooling or ridesharing program.[9] Further, Defendants' cramped reading of the statute is inconsistent with the Statute's legislative history, which shows

---

[8] In addition, Defendants, through the Zimride business, assist individual drivers in implementing ridesharing and carpooling programs. Zimride's terms and conditions take great pains to explain that *it* does not provide ridesharing and carpooling services itself, but only assists "third party transportation providers" in providing such services. (*See* Declaration of Michelle Ybarra ("Ybarra Decl."), Ex. F (Dkt. 36-6) at 2 (of 9) ("Zimride does not provide transportation services . . . It is up to the third party transportation provider, driver or vehicle operator to offer transportation services . . . .") (original in caps).) Thus, when Zimride acquired or had access to Plaintiff's personal information, it did so in the course of assisting not only Lyft and Enterprise in implementing their ridesharing programs, but also in the course of assisting drivers—"third party transportation providers" to use Zimride's terminology—in implementing their own carpooling or ridesharing programs, *i.e.*, actually carpooling or sharing a ride with Plaintiff.

[9] *See*, *e.g.*, *United States v. Farries*, 459 F.2d 1057, 1064 (3d Cir. 1972) ("The word 'assists' must be given its plain meaning. One who willfully participates in a mutiny or riot plainly 'assists . . . any mutiny or riot' . . . ."). Here, just as one who participates in a mutiny or riot "assists" in the mutiny or riot, one who participates in the implementation of a ridesharing program (like Defendants) "assists" in the implementation of the ridesharing program. As such, Plaintiff is at a loss to understand how Defendants' own explanation of the statute—i.e., that "[b]y its plain terms, the statute only proscribes the conduct of those who "assist" some private entity [establishing its carpool program]," (Dkt. 34 at 7)—wouldn't cover the Defendants' employees tasked with implementing or otherwise working on the Zimride business.

absolutely no intent to exclude from the statute's proscriptions private entities who establish carpooling and ridesharing programs in-house. (*See*, *e.g.*, Thomassen Decl., Ex. A at 19 ("The purpose of the measure is to protect the confidentiality of personal information being gathered at an increasing rate by businesses in the formation of carpool and rideshare programs.").)

For example, to start the legislative process, Assemblywoman Gwen Moore asked the legislative counsel to "draft legislation which makes unlawful the sale, distribution, or dissemination of any information acquired for the purpose of establishing car pools or ridesharing by private companies on behalf of the general public." (Thomassen Decl, Ex. A at 81 (Jan. 26, 1990 Letter form Gwen Moore to Bion Gregory).) Likewise, in a letter several months later requesting that Governor Deukmejian sign the bill, Assemblywoman Moore described it as a bill that "prohibits the disclosure of any personal information gathered for purposes of establishing or implementing carpooling or ridesharing programs without the prior written consent of the individual." (Thomassen Decl, Ex. A at 53 (July 10, 1990 Letter from Gwen Moore to Governor George Deukmejian).) In neither letter—nor anywhere else in the legislative history—is there any suggestion that the statute is limited only to third-party contractors who assist others in establishing or implementing carpooling or ridesharing programs, rather than including private entities whose own employees assist them.

Thus, while Defendants point to specific portions from the statute's legislative history as "indicating that [the Rideshare Privacy Statute] was created to regulate the use of personal data that employers provided to commuter rideshare agencies," (Mot. at 7 (citing Ybarra Decl., Ex. I at 4 (of 13), Dkt. 36-9), those portions provide no such indication. Instead, for example, Defendants' chosen page from the statute's "legislative analysis" summarizes the overall purpose of the statute explicitly—"SUMMARY: Prohibits the disclosure of personal information obtained in connection with ridesharing programs, without the written consent of the individual." (Ybarra Decl., Ex. I at 4, Dkt. 36-9.) This express statutory purpose is repeated again and again throughout the statute's legislative history, and is *not* limited—as Defendants suggest—to the employer/third-party commuter rideshare agency relationships. (*See*, *e.g.*, *id.* at 2 ("Purpose. . . . [A]s private and public ridesharing companies proliferate, the need is increasing to protect the confidentiality of the

information these companies have access to or acquire); *id.* at 8 (same); *id.* at 13 ("The purpose of the measure is to protect the confidentiality of personal information being gathered at an increasing rate by businesses in the formation of carpool and rideshare programs.").)

In short, the Ridesharing Privacy Statute plainly covers the Defendants. They cannot absolve themselves of liability for routinely and automatically disclosing Zimride users' personal information to third party analytics companies simply because they chose to employ—rather than engage as third-party contractors or consultants—persons to assist them in establishing or implementing their rideshare programs.

### B. The Zimride program is a "carpooling or ridesharing program."

Defendants next argue that they are not covered by the statute because the Zimride program does not fall within the statutory definition of "carpooling or ridesharing program[]." Yet, while Defendants assert that "'carpooling or ridesharing programs' are defined to include only 'the formation of carpools, vanpools, buspools, the provision of transit routes, rideshare research, and the development of other demand management strategies such as variable working hours and telecommuting,'" (Dkt. 34 at 7) (quoting Cal. Penal Code § 637.6(b)), the statute does not say "only." To the contrary, the statute says that "'carpooling or ridesharing programs' *include, but shall not be limited to*," the listed examples. Cal. Penal Code § 637.6(b) (emphasis added).[10]

As both state and federal courts in California have recognized, a list following the term "includes" in a statute is illustrative, not exhaustive. *See, e.g., Flanigan v. Flanigan*, 41 P.3d 575, 580 (Cal. 2002) ("The statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions.") (internal quotations omitted); *FTC v. MTK Mktg., Inc.*, 149 F.3d 1036, 1040 (9th Cir. 1998) ("[I]n terms of statutory construction, use of the word 'includes' does not connote limitation.") (internal quotations omitted). *See also Fed.*

---

[10] Defendants' counsel's mischaracterization of the statutory definition as including "only" the listed examples comes dangerously close to violating their obligations under state and local rules of professional conduct. *See* Cal. Rules of Prof'l Conduct 5-200(B), (C) ("In presenting a matter to a tribunal, a member … shall not seek to mislead the judge … by [a] false statement of fact or law [and] shall not intentionally misquote to a tribunal the language of a … statute…."); N.D. Cal. Civil Local Rule 11-4(a) (requiring attorneys practicing before this Court to comply with California Rules of Professional Conduct).

*Land Bank of St. Paul v. Bismark Lumber Co.*, 314 U.S. 95, 99-100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."). Here, the statute emphasizes that the list of carpooling and ridesharing programs is illustrative, not exhaustive, by inserting the phrase "but shall not be limited to" between "include" and the list. Cal. Penal Code § 637.6(b). *See also United States v. Phillip Morris USA Inc.*, 566 F.3d 1095, 1115 (D.C. Cir. 2009) (noting that while use of the word "includes" is alone sufficient to indicate a non-exclusive list, "adding 'but not limited to' helps to emphasize the non-exhaustive nature" of a statutory listing).

Thus, to fall within the statutory definition of "carpooling or ridesharing programs," the Zimride program need not actually be one of the listed examples. And here, the Zimride program clearly is a carpooling or ridesharing program: Zimride matches up drivers with empty seats on the one hand with riders seeking to occupy those empty seats on the other. (Dkt. 29 ¶¶ 12-17); (Dkt. 36-6 at 2) (Zimride terms of service explaining that "Zimride.com is an online service that provides a venue to enable persons who seek transportation to certain destinations ('Riders') to find and choose persons driving to or through those destinations ('Drivers').") Indeed, Zimride itself repeatedly uses the terms "ridesharing" and "carpooling" in describing the program, for example: (1) explaining on its website that it is "a new spin on ridesharing," *How it Works*, Zimride, http://www.zimride.com/howitworks/ (last visited May 12, 2014); (2) prominently declaring "RIDESHARING FOR EVERYONE," *id.*; (3) labeling the bottom of each page on its website "Zimride Carpool & Rideshare Community," *see, e.g., id.*; (Dkt. 36-1 at 2); (4) describing itself as "the industry leading rideshare service," *Blog*, Zimride, http://www.zimride.com/blog/ (last visited May 12, 2014); (5) stating in its privacy policy that it may contact users "to suggest potential carpool matches," (Dkt. 36-6 at 7); and (6) providing numerous links to press articles describing Zimride as ridesharing or carpooling, *Press*, Zimride, http://www.zimride.com/press/ (last visited May 12, 2014).[11]

---

[11] Even in its Motion to Dismiss, Zimride refers to itself as a "peer-to-peer ridesharing platform." (Dkt. 34 at 7.) Defendants provide absolutely no explanation of why a "peer-to-peer ridesharing platform" is not a "carpooling or ridesharing program[]."

While Defendants assert that the statute was intended to cover only commuter carpooling, not ridesharing on occasional road trips (Dkt. 34 at 7), nothing in the statutory language or legislative history so limits the statute—which, of course, says "ridesharing" on its face. Indeed, the stated purpose of the statute is to protect the confidentiality of personal information obtained by carpooling and ridesharing companies. (Thomassen Decl., Ex. A at 2 (Comments on Assembly Committee on Public Safety Apr. 17, 1990 Hearing for AB 3984).) Zimride cites to nothing to show the legislature would distinguished between commuter carpooling and long-distance ridesharing when seeking to protect the privacy of drivers' and riders' personal information.

To be sure, Defendants' assertion that the Zimride program is not a ridesharing or carpooling program under the statute fails.

**C. Zimride "acquires [and] has access to" its users' personal information.**

Defendants next argue that they do not "acquire[] or ha[ve] access to" personal information as required by the statute, apparently because Zimride users input their own personal information directly into the Zimride business platform. (Dkt. 34 at 7-8) (quoting Cal. Penal Code 637.6(a)). But simply to state the argument is to refute it. If Zimride users input personal information, then Zimride (and, consequently, Defendants) acquires and has access to that information. The question posed by the statute isn't *how* Defendants acquire or have access to users' personal information, but simply *whether* they do "in the course of business." Cal. Penal Code § 637.6(a). Here, the Zimride business—as operated for Lyft or Enterprise—is premised upon first acquiring and accessing Zimride users' personal information, and then using that information to establish the Lyft and Enterprise rideshare programs. Defendants' argument is nonsensical.

Defendants further argue that the information they acquire from users like Plaintiff is not "personal information" under the statute because the statute defines "personal information" as residence address, employment address, and hours of employment. (Dkt. 34 at 9-10.) But as with their invocation of the meaning of "carpooling or ridesharing programs," Defendants completely (and potentially unethically) forget to mention that the statute expressly describes "personal information" as "*including, but not limited to*" addresses and work hours. Cal. Penal Code § 637.6(a) (emphasis added). Here, Defendants acquire and have access to—and disclose to

Mixpanel—users' genders, ages, zip codes, trip details, and Facebook profiles, which further includes users' names, addresses, e-mail addresses, and information about their likes and dislikes. (Dkt. 29 ¶¶ 19, 25.)[12] Such information is quite personal in nature—it is all about the identity of Zimride users—and Defendants' argument that it does not fall within the statute is simply disingenuous and without merit.

### D. Zimride's disclosure of personal information to Mixpanel was not for the purpose of implementing the rideshare program.

Defendants next argue that Plaintiff fails to allege that Zimride's disclosure of personal information to Mixpanel was not for the purpose of implementing the Defendants' ridesharing programs. (Dkt. 34 at 9.) To the contrary, however, the Complaint specifically alleges that Zimride disclosed its users' personal information to Mixpanel for a specific purpose: "to compile comprehensive profiles of consumers' entire digital lives," which "can be used for targeted advertising, sold as a commodity to other data brokers, or mined to produce valuable reports." (Dkt. 29 ¶ 4.) Such disclosure is not for the purpose of establishing or implementing the Zimride (or any other) ridesharing program, and thus falls within the statute's prohibition.[13] And even assuming *arguendo* that Zimride did disclose such information to Mixpanel for the purposes of implementing a rideshare program (it did not—and no such purpose is alleged), the above-stated purpose for disclosing (i.e., for consumer profiling) clearly has nothing to do with any supposed program implementation and, as such, violates the statute.

Further, contrary to Defendants' assertion (*see* Dkt. 34 at 11-12), the Complaint sufficiently alleges the form and content of the disclosures. Plaintiff specifically alleges that, once a user submits his or her upcoming trip information, Zimride surreptitiously transmits the user's trip

---

[12] Defendants assert that Plaintiff has not alleged that the personal information contained in users' Facebook links disclosed by Zimride is accessible to Mixpanel. (Dkt. 34 at 10.) That is not true. The Complaint expressly alleges that after Defendants send a link to users' Facebook profiles, "Mixpanel is … able to extract all available information from users' Facebook profiles." (Dkt. 29 at 7.)

[13] While Defendants assert that Mixpanel was "retained by Defendants to assist them in optimizing their ridesharing service" (Dkt. 34 at 1), the Complaint makes no such allegation. Defendants are, of course free to make this argument in moving for summary judgment; but for this motion, Defendants must constrain themselves to the pleadings—which say no such thing.

details and other sensitive personal information to Mixpanel following a user's submission of upcoming trip information by sending Mixpanel a digital message containing information about that user's gender, age, zip code, and planned trip. (Dkt. 29 ¶¶ 3, 19, 28.) Plaintiff further alleges that the message sent to Mixpanel contains a link to the user's Facebook profile, from which Mixpanel is able to extract additional information about the user such as name, address, e-mail address, and information about the user's likes and dislikes. (*Id.* ¶¶ 19, 25.) Finally, Plaintiff alleges that *his* personal information was disclosed by Zimride to Mixpanel in this manner. (*Id.* ¶¶ 33-34.) Such allegations are far from "naked assertions devoid of further factual enhancement" that fail to "give Defendants fair notice of what the claim is and the grounds on which it rests." (Dkt. 34 at 12) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Thus, Plaintiff has sufficiently alleged disclosures of personal information for a purpose other than establishing or implementing a carpooling or ridesharing program.

**E. Plaintiff did not consent to Zimride's disclosure of his personal information to Mixpanel.**

Defendants next argue that Plaintiff failed to sufficiently allege that he did not consent to Zimride's disclosure of his personal information to Mixpanel. As an initial matter, it should be noted that lack of consent for a defendant to engage in unlawful activity is not typically an element of a plaintiff's claim, but rather consent is an affirmative defense to such a claim. *Cf. Heinrichs v. Wells Fargo Bank, N.A.*, No. C 13-05434 WHA, 2014 WL 985558, *2-3 (N.D. Cal. Mar. 7, 2014) (holding—with respect to a statute prohibiting certain telemarketing calls without the recipient's consent—that consent is an affirmative defense and plaintiffs are not required to plead lack of consent). Thus, the burden here is on Defendants to plead and ultimately establish consent to disclose Zimride users' personal information to Mixpanel, rather than on Plaintiff to allege lack of consent.[14]

[14] Defendants cite *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 414 (9th Cir. 1996) for the proposition that Plaintiff is required to allege lack of consent. (Dkt. 34 at 11.) The cursory mention of consent in that case, however, is *dicta* that is completely irrelevant here. That case, involving a right of publicity statute, simply listed the elements of a right of publicity claim, including "lack of consent" in that list. *Id.* Lack of consent there was undisputed, however, *see id.* at

In any event, even if Plaintiff were required to plead lack of consent, he does so here. Plaintiff specifically alleges that his and other Zimride users' personal information was disclosed to Mixpanel without their consent. (Dkt. 29 ¶¶ 33-34, 46.) Indeed, Plaintiff alleges that he did not even know that his personal information was being disclosed to Mixpanel because Defendants never informed him that they were doing so. (Dkt. 29 ¶ 18.) This is in stark contrast to the case cited by Defendants as "instructive," *In re Google, Inc. Privacy Policy Litigation*, No. C-12-01382-PSG, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013). (Dkt. 34 at 11.) In that case, unlike here, the complaint alleged that Google had clearly explained to plaintiff and other users precisely how it shared their names and likenesses with third-parties. 2013 WL 6248499 at *13.

Defendants argue that despite Plaintiff's clear allegations to the contrary, he nevertheless consented to Zimride's disclosure of his personal information to Mixpanel pursuant to a paragraph in Zimride's privacy policy. (Dkt. 34 at 15.) This attempt to undermine Plaintiff's allegations that he did not consent to the disclosure of his personal information fails for three reasons, however: First, the privacy policy on which Defendants rely is outside the pleadings, and thus not properly considered on a motion to dismiss.[15] Second, even if the privacy policy could be considered here, Plaintiff did not assent to the privacy policy, and is thus not bound by any terms contained therein. Third, even if the privacy policy could be considered on a motion to dismiss, and even if Plaintiff were bound by it, the privacy policy doesn't even allow Zimride to make the disclosures alleged here.

### *1. The privacy policy may not be considered on a motion to dismiss.*

"As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Here, the privacy policy on which Defendants rely to argue that Plaintiff consented to the disclosure of his information was not part of the pleadings—indeed, even Defendants admit that "the Complaint does not specifically refer to Zimride's Terms of Service and Privacy Policy," but

---

409, and nowhere did the court hold that a plaintiff is required to plead lack of consent in a right of publicity—or any other—claim.

[15] This fact is taken up in more detail in Plaintiff's Opposition to Defendants' Request for Judicial Notice, filed concurrently herewith.

nevertheless believe that Plaintiff's "claim depends on [its] contents."[16] (Dkt. 35 at 6.) The privacy policy was neither attached to nor referenced anywhere within the Complaint. Defendants assert that this Court may consider the privacy policy because "[P]laintiff's claim depends on the contents of [that] document" (Dkt. 34 at 14 n.8 (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *see* Dkt. 35 at 3) (same)), but that simply is not the case. While Defendants may wish to use the privacy policy to assert a defense, Plaintiff's claim—that Defendants disclosed his personal information to Mixpanel in violation of Cal. Penal Code § 637.6—in no way depends on the contents of the privacy policy.[17]

*Knieval* is inapposite. There, celebrity daredevil Evel Knievel brought a defamation claim relating to a photograph of him and an accompanying caption that had been posted by television sports network ESPN on a page of its website. The court held that it could consider the entire webpage, which included photos of numerous other celebrities, to determine whether the photograph of Knievel and the accompanying caption were defamatory in context. *Knievel* thus stands for the proposition that where a plaintiff asserts a claim based on a portion of a document, the court may consider the rest of that document in deciding a Rule 12(b)(6) motion to dismiss. Consequently, if Plaintiff here had relied on part of the privacy policy for his claim, then of course this Court could consider the rest of the privacy policy. But Plaintiff's claim that Zimride unlawfully disclosed his personal information does not rely on any portion of the policy. As a result, the general rule regarding consideration of materials outside the pleadings holds, and this Court may not consider the privacy policy when deciding Defendants' Rule 12(b)(6) motion.

---

[16] In their separately filed Request for Judicial Notice, (Dkt. 35), Defendants also move the Court to take judicial notice of three screenshots from the Zimride website. (Dkts. 31-1, 31-2, 31-3.) Although Plaintiff takes issue with the argumentative language in Defendants' Request for Judicial Notice—e.g., that the Complaint's use of screenshots from the Zimride website is "misleading[]" or that Zimride users' "must agree to [Zimride's Terms of Serbvice and Privacy Policy] by clicking [an] "Okay" button"—Plaintiff does not contest the accuracy of the three screenshots or the Court's consideration of them.

[17] In addition, and as further described in his Opposition to Defendants' Request for Judicial Notice, Plaintiff has no way of knowing whether the older versions of Defendants' privacy policies offered by Defendants—i.e., as were purportedly in effect at the time that Plaintiff created his account, (Dkts. 31-4 & 5)—are authentic, either in terms of their content or how they were presented on the Zimride website when users signed up for accounts or posted rides. Because the documents are necessarily in dispute, they may not be considered here.

### 2. *Plaintiff did not assent to the privacy policy.*

In any case, even if this Court could consider the privacy policy on a motion to dismiss, it is not binding on Plaintiff (or any other Zimride user) because there was no assent to the privacy policy. In order for the privacy policy to constitute a binding contract, there must be a manifestation of mutual asset to the agreement. *Binder v. Aetna Life Ins. Co.*, 89 Cal. Rptr. 2d 540, 551 (Cal. Ct. App. 1999). Here, there was none.

Defendants assert that Zimride users such as Plaintiff assent to the privacy policy because they had to click an "Okay" button to proceed past the Zimride login screen, and the login screen contained a hyperlink to the privacy policy. (Dkt. 34 at 12-14.) While manifestation can take the form of conduct, rather than words, *Binder*, 89 Cal. Rptr. 2d at 551, "a consumer's clicking on a [website] button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the . . . button would signify assent to those terms," *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29-30 (2d Cir. 2002) (applying California law). Here, the login screen did *not* make clear that a user's clicking on the "Okay" button would signify assent to the privacy policy.

A comparison to the cases cited by Defendants is instructive. In *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 908 (N.D. Cal. 2011), for example, the first time a user played a game called YoVille through Facebook, they were presented with a screen request stating "Allow Access? Allowing YoVille access will let it pull your profile information, photos, your friends' info, and other content that it requires to work," underneath which was a button marked "Allow." So far, this is quite similar to the Zimride login screen, which reads "Log in with Facebook. Zimride will receive the following info: your public profile, friend list, email address, birthday, work history, education history, events, hometown, interests, current city, personal description and likes," underneath which is a button marked "Okay." (Dkt. 34. At 13.)

The similarities end there, however, because—crucially—the webpage at issue in *Swift* went on to explicitly state: "By proceeding, you are allowing YoVille to access your information and you are agreeing to the [blue hyperlink] Facebook Terms of Service in your use of YoVille. By using YoVille, you also agree to the YoVille [blue hyperlink] Terms of Service." *Swift*, 805 F. Supp. 2d at

908 (bracketed insertions in original).[18] No such language expressly stating that by clicking a button or proceeding past the webpage the user was agreeing to be bound by those website's terms appears on the Zimride login screen, which simply includes hyperlinks to "App Terms" and "Privacy Policy" with no further explanation. (*See* Dkt. 36-3 at 2.) The mere presence of hyperlinks on the bottom of a webpage without further explanation is not sufficient to make the act of clicking "Okay" akin to the manifestation of assent to documents to which those hyperlinks connect. *See Specht*, 306 F.3d at 23-24, 29-32 (finding no assent to terms in license agreement where webpage merely linked to license agreement, but did not provide "reasonably conspicuous notice that [users] are about to bind themselves to contract terms"). *See also Nguyen v. Barnes & Noble, Inc.*, No. 8:12-cv-0812-JST (RNBx), 2012 WL 3711081, *2 (C.D. Cal. Aug. 28, 2012) (holding terms of use not binding where hyperlink to terms was located in bottom left corner of webpage from which customer makes purchase, and where customers were not "specifically direct[ed]" to the terms before purchase); *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 936-37 (E.D. Va. 2010) (holding terms of use not binding where webpage simply included hyperlink to terms that users were not required to click on, read, or assent to in order to proceed).[19] Thus, Plaintiff did not assent to Zimride's privacy policy, and it is therefore not binding on him.

---

[18] The websites in the other cases cited by Defendants contained similar language to that in *Swift*. *See Cairo, Inc. v. Crossmedia Servs., Inc.*, No. C 04-04825 JW, 2005 WL 756610, *2 (N.D. Cal. Aug. 28, 2012) ("By continuing past this page and/or using this site, you agree to abide by the *Terms of Use* for this site…."); *Ticketmaster LLC. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1107 (C.D. Cal. 2007) ("Use of this website is subject to express *Terms of Use* . . . By continuing past this page, you agree to abide by these terms."); *Molnar v. 1-800-Flowers.com, Inc.*, No. CV 08-0542 CAS (JCx), 2008 WL 4772125, *1 (C.D. Cal. Sept. 29, 2008) ("By accessing any areas of the web site you agree to be legally bound, and to abide by, these Terms of Use."). These cases are distinguishable on other grounds as well. For instance, *Cairo* did not involve human beings visiting websites, but rather computer programs (variously referred to as "robots," "spiders" or "crawlers") automatically visiting websites to extract data from them. 2005 WL 756610 at *3. In *Ticketmaster*, not only did the website expressly contain the language quoted above, but "since 2003, users of ticketmaster.com have had to affirmatively agree to the Terms of Use as part of the procedure to set up an account, and since mid-2006, users have had to affirmatively agree to the Terms of Use for every ticket purchase." 507 F. Supp. 2d at 1107.

[19] Further, even if users thought that by clicking "Okay" they were assenting to the "App Terms" and "Privacy Policy" linked on the login screen, there is nothing on the login screen to even suggest that they were assenting to *Zimride's* terms or policies. To the contrary, the login screen is *entirely* branded with Facebook's look and feel: the login screen's URL address bar contains a Facebook icon and facebook.com address, and the login screen prominently displays the Facebook logo and Facebook's familiar blue color scheme. Any reasonable user could believe that the "App Terms" and "Privacy Policy" hyperlinks refer to *Facebook's* terms and policies, rather than

***3. The privacy policy does not allow Zimride to make the disclosures alleged here.***

Regardless, even if this Court could consider the privacy policy, and even if it were binding on Plaintiff and other Zimride users, it does not allow Zimride to disclose personal information to Mixpanel, and thus does not constitute consent by Plaintiff to the disclosures alleged here. The privacy policy language on which Defendants rely states that Zimride may share users' personal information with third parties "so that they can provide [Zimride] with support services such as email origination, receipt or support services, customer relationship management services and order fulfillment." (Dkt. 34 at 15.) But Plaintiff does not allege that his personal information was disclosed to Mixpanel so that Mixpanel could provide support services to Zimride. He alleges that Zimride disclosed his and other users' personal information to Mixpanel "to compile comprehensive profiles of consumers' entire digital lives," which "can be used for targeted advertising, sold as a commodity to other data brokers, or mined to produce valuable reports." (Dkt. 29 ¶ 4.) That purpose brings Zimride's disclosures outside the permitted scope of the Rideshare Privacy Statute and, thus, carries liability—and Defendants are not free to selectively ignore Plaintiff's allegations.

Compiling profiles of consumers' entire digital lives for advertising or sale to data brokers is not "email origination, receipt or support services, customer relationship management [or] order fulfillment" supporting Zimride's ridesharing services. And because disclosure of personal information for those purposes is the only kind of disclosure permitted under the privacy policy, the privacy policy does not allow the disclosures alleged here. Consequently, even if this Court could consider the privacy policy on a motion to dismiss (which it cannot), and even if Plaintiff were bound by the privacy policy (which he is not), the privacy policy does not establish Plaintiff's consent to Zimride's disclosure of his personal information to Mixpanel.

For all these reasons, Defendants' consent argument fails.

---

Zimride's. And here, because every Zimride user is *necessarily* already a Facebook user (i.e., because they could only access Zimride's services by signing in through their Facebook account), the confusion is almost guaranteed. Stated simply, the user is given no incentive or reason to click on or otherwise review the terms that Defendants say apply here.

**F. Plaintiff has standing to pursue his claim.**

Finally, in a footnote, Defendants assert that Plaintiff fails to allege injury in fact sufficient to establish Article III standing. (Dkt. 34 at 10 n.6.) As the Ninth Circuit has repeatedly held, however, "[t]he injury required by Article III can exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Fulfillment Servs. Inc. v. United Parcel Serv., Inc.*, 528 F.3d 614, 618-19 (9th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)); *Edwards v. First Am. Corp.*, 610 F.3d 514, 517 (9th Cir. 2010) (quoting *Fulfillment Servs.*, 528 F.3d at 618-19). When statutory violations are at issue, "the standing question in such cases is whether the … statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Edwards*, 610 F.3d at 517 (quoting *Warth*, 422 U.S. at 500); *Fulfillment Servs.*, 528 F.3d at 619. Thus, if a plaintiff has a cause of action for a statutory violation, that plaintiff has Article III standing without the need for any additional injury; the violation of the plaintiff's rights under the statute *is* the injury. *See, e.g., Edwards*, 610 F.3d at 518 ("Because [the statute at issue] gives Plaintiff a statutory cause of action, we hold that Plaintiff has standing to pursue her claims against Defendants."); *Fulfillment Servs.*, 528 F.3d at 619 (holding that plaintiff's statutory cause of action conferred Article III standing); *Robins v. Spokeo, Inc.*, 742 F.3d 409, 413-14 (9th Cir. 2014) ("[A]lleged violations of [plaintiff's] statutory rights are sufficient to satisfy the injury-in-fact requirement of Article III.").[20]

Here, Plaintiff alleges that Defendants violated his statutory privacy rights under Cal. Penal Code § 637.6, which protects his personal information from disclosure in the establishment or implementation of carpooling or ridesharing services. This right is enforceable through a cause of action under Cal. Penal Code § 637.2, which allows "any person who has been injured by a violation of this chapter [to] bring an action against the person who committed the violation." Thus,

[20] While *Edwards*, *Fulfillment Servs.*, and *Robins* all dealt with federal statutes, their holdings apply equally to state statutes. *See, e.g., In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, *17 (N.D. Cal. Sept. 26, 2013) ("The reasoning of these cases that find standing when there is an allegation of a [federal statutory] violation applies equally to [Cal. Penal Code § 637.2].")

because Plaintiff has a cause of action against Defendants for violation of his statutory rights, he has Article III standing.

Though their argument is not entirely clear, Defendants seem to suggest that § 637.2 requires some actual injury beyond invasion of Plaintiff's statutory rights. But this argument is contrary to the express language of that section, which states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." Cal. Penal Code § 637.2(c). Indeed, as the California Supreme Court has noted, "[section 637.2] authorizes civil awards of [now $5,000] for each violation of the Privacy Act despite a party's inability to prove actual injury." *Ribas v. Clark*, 696 P.2d 637, 643 (Cal. 1985). *See also Friddle v. Epstein*, 21 Cal. Rptr. 2d 85, 92 (Cal. Ct. App. 1993) ("Section 637.2 is fairly read as establishing that no violation of the Privacy Act is to go unpunished. *Any* invasion of privacy involves an affront to human dignity which the Legislature could conclude is worth at least [now $5,000].") (emphasis added). Consequently, Defendants' alleged invasion of Plaintiff's statutory right not to have his personal information disclosed is alone sufficient to create a cause of action under § 637.2, and thus sufficient injury to establish Article III standing—a conclusion that other courts within this district have reached without undue fanfare. *See In re Google*, 2013 WL 5423918, *17 ("[T]he Court finds that the allegation of a violation of [the Privacy Act] . . . is sufficient to confer standing without any independent allegation of injury.").[21]

## IV. CONCLUSION

Because Plaintiff sufficiently alleges that Defendants' disclosure of his personal information to Mixpanel violates the Ridesharing Privacy Statute, Defendants' motion to dismiss should be denied.

---

[21] Neither of the two cases cited by Defendants in support of their standing argument, *In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) and *Yunker v. Pandora Meida, Inc.*, No. 11-CV-03113 JSW, 2013 WL 1282980 (N.D. Cal. Mar. 26, 2013), involved § 637.2 and its express statement that no actual injury is required. *See, e.g., In re iPhone*, 2011 WL 4403963 at *6 ("Plaintiffs, in the instant case, do not allege a violation of an analogous statute which does not require a showing of injury.").

Respectfully submitted,

**MIGUEL GARCIA**, individually and on behalf of all others similarly situated,

Dated: May 12, 2014

By: /s/ Benjamin S. Thomassen
One of Plaintiff's Attorneys

Mark Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
Jack Yamin (Admitted *Pro Hac Vice*)
jyamin@edelson.com
Chandler R. Givens (Admitted *Pro Hac Vice*)
cgivens@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff and the Putative Classes*